IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| MARK A. AMBROSE,<br><br>               Plaintiff,<br><br>    vs.<br><br>TRICON TIMBER, LLC,<br><br>               Defendant. | CV 15–113–M–DWM<br><br>ORDER |

Plaintiff Mark Ambrose ("Ambrose") sued his former employer Defendant Tricon Timber, LLC ("Tricon"), alleging injury arising out of his exposure to toxic chemicals during his employment. (Doc. 1.) Tricon seeks summary judgment on the grounds that Ambrose failed to file his claim within the applicable statute of limitations period. (Doc. 15.) Tricon argues that the applicable statute of limitations period expired by the time Ambrose brought suit in August 2015 because he was aware the chemicals were toxic and he believed he was experiencing harmful health effects during his employment in 2012. Ambrose insists that while he knew the chemicals were harmful and he believed they were causing his health issues, the necessary causal link was missing because the

1

"veracity of his belief" was not known until he received a medical opinion to that effect in September 2013. Genuine issues of material fact prevent a legal determination as to whether Ambrose's condition was self-concealing and whether he acted diligently in seeking the cause of his injury. Having reviewed the briefing and heard argument from the parties, Tricon's motion is denied.

## BACKGROUND

Tricon operates a lumber mill in St. Regis, Montana. Ambrose was employed at the mill from July 2011 until March 2012. (Stip. Facts, Doc. 14 at ¶ 4(g), (n).) During his employment, Ambrose operated a grapple loader, chip trucks, and forklift. (Pl.'s SDF, Doc. 23 at ¶ 21.) Near the end of 2011, he also started working in a room known as the "dip tank," (*id.*), where chemicals were used to treat bulk wood product to prevent mold and preserve the wood, (*id.* at ¶ 23). Ambrose mixed the chemical solution using AntiBlu XP64 and, using a forklift to bring the wood into the dip tank room, submerged the wood into the tank to let it soak. (*Id.* at ¶ 24) At the time, Ambrose knew that the chemicals he was working with were toxic and dangerous and he requested safety equipment and a respirator. (*Id.* at ¶¶ 26-28.) Also at the time of his exposure, Ambrose experienced symptoms such as nausea and physical burns on his hands, cheeks, in his nostrils, and in his lungs. (*Id.* at ¶¶ 30, 48.) Ambrose shared his complaints

about the safety of the work conditions and his health concerns with friends. (*Id.* at ¶¶ 31, 34, 35, 36.) He also recorded a video of the dip tank room and surrounding facilities, in which he states that he was working in a dangerous situation and felt that he was in harm's way. (*Id.* at ¶ 32.)

In March 2012, Ambrose left Montana and his employment at Tricon and moved to Florida. (*Id.* at ¶ 37.) After leaving Tricon, Ambrose initially felt better and his symptoms appeared to have subsided. (*Id.* at ¶ 49.) In June 2012, he went to the hospital in Florida complaining of chest pain. (*Id.* at ¶ 51.) He had previously had a heart attack around 2005 and had a pre-existing cardiac condition and family history of cardiac issues. (*Id.* at ¶ 51.) He was hospitalized for a few days and his treating physicians attributed his complaints to his cardiac issues, never raising the possibility of lung damage. (*Id.*) He returned to the hospital four times in 2013 (March 18, August 8, August 20, and August 30), experiencing chest pain and shortness of breath. (*Id.* at ¶¶ 52-56.) Until this point, treatment focused on Ambrose's cardiac issues and he was not diagnosed with a lung condition. (*Id.* at ¶ 57.) On September 5, Ambrose went to the hospital again with similar complaints and, for the first time, was diagnosed with a permanent lung condition, persistent severe asthma exacerbation, or possible Reactive Airways Disease Syndrome. (*Id.* at ¶ 58.) He was placed on pulmonary medication, and on

3

December 9, 2013, his medical records reflect for the first time a potential association between his lung damage and his exposure to carbonic acid. (*Id.* at ¶¶ 59, 60.) Medical records dated January 2, 2014, state, "they are now considering poisoning by Antiblu XP64" as the cause of his condition. (*Id.* at ¶¶ 61, 62.)

## STANDARD

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248. "[I]n ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, ___ U.S.___, 134 S. Ct. 1861, 1863 (2014) (per curiam) (internal quotation marks and alterations omitted).

## ANALYSIS

Ambrose alleges that Tricon committed battery when it intentionally exposed him to harmful chemicals. (Doc. 1 at ¶¶ 51-59.) The applicable period of

4

limitations for a battery claim is two years. Mont. Code Ann. § 27-2-204(3). That two-year period begins when a claim accrues, § 27-2-102(2), which is "when all elements of the claim or cause exist or have occurred" or "the right to maintain an action on the claim or cause is complete," § 27-2-102(1)(a). A "[l]ack of knowledge of the claim or cause of action, or of its accrual . . . does not postpone the beginning of the period of limitation." § 27-2-102(2). However, "when the facts constituting the claim are by their nature concealed or self-concealing, the period of limitations does not commence 'until the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party.'" *Kaeding v. W.R. Grace & Co.-Conn.*, 961 P.2d 1256, 1259-60 (Mont. 1998) (quoting § 27-2-102(3)).

The initiation of the limitations period is ordinarily an issue of fact, and disputed issues of material fact as to whether an injury was self-concealing and whether a plaintiff exercised due diligence "must be resolved by the trier of fact." *Christian v. Atl. Richfield Co.*, 358 P.3d 131, 153 (Mont. 2015). "When there is conflicting evidence as to when a cause of action accrued, the question of whether an action is barred by the statute of limitations is for the jury to decide." *Johnston v. Centennial Log Homes & Furnishings, Inc.*, 305 P.3d 781, 788 (Mont. 2013) (internal quotation marks and alteration omitted). That is the case here.

5

The parties first dispute whether Ambrose's injury was self-concealing. An example of a self-concealing injury is one "where the symptoms of an illness are immediately apparent, but the illness is diagnosed as the result of chemical exposure only years later." *Christian*, 358 P.3d at 153. "This is true even where plaintiffs have asserted long-standing beliefs or suspicions regarding the link between the symptoms and their ultimate cause." *Id.* In *Hando v. PPG Industries, Inc.*, the plaintiff was exposed to paint fumes while working at a coal processing plan in 1981 and 1982. 771 P.2d 956, 958 (Mont. 1989). Hando experienced symptoms at the time of her employment, including losing consciousness, and she suffered from physical, mental, and emotional ailments in the years following her exposure. *Id.* Between 1982 and 1984, none of the physicians who examined Hando attributed her continuing ailments to her previous exposure to the paint. *Id.* at 962. Hando did not commence her tort action until 1985, after she received a medical opinion in early 1984 that her problems were caused by her earlier exposure. *Id.* at 958. The Montana Supreme Court held that the statute of limitations tolled during that time because the necessary causal element was not known until Hando received the diagnosis linking her ailments to her exposure and that her failure to learn the cause of her injuries was not due to a lack of due diligence. *Id.* at 962. The Court reached a similar conclusion in *Nelson v. Nelson*.

50 P.3d 139, 143 (Mont. 2002). There the plaintiff alleged negligence in connection with injuries she sustained as a result of exposure to certain chemicals and an accidental injection of bovine ecthyma vaccine while working at a ranch. *Id.* at 140-41. The Court held that the limitations period tolled until a treating physician stated that the plaintiff's exposure and injection years before resulted in her medical condition. *Id*. at 143; *see also Muller v. Decker Coal Co.*, 87 F.3d 1321 (9th Cir. 1996) (unpublished) (holding that pursuant to *Hando*, the statute of limitations was tolled on the plaintiffs' claim because their belief that their health problems were caused by a coal mine was not verified until they received a diagnosis years later).

In an attempt to distinguish this case from *Hando* and *Nelson*, Tricon relies on the Montana Supreme Court's decision in *Kaeding*. *See* 961 P.2d 1256. The plaintiff in *Kaeding* was exposed to vermiculite during his employment with W.R. Grace and suffered lung- and heart-related ailments for decades. *Id.* at 1258. The Court explicitly held that a medical diagnosis need not be rendered before the statute of limitations may run so long as other facts establish that the veracity of the plaintiff's belief about the nature of his injury and its cause before a formal diagnosis. *Id.* at 1260. The Court distinguished *Hando*, noting that Kaeding's medical records contained several references to asbestosis prior to his actual

7

diagnosis in the mid-1990s. *Id*. The Court also noted that Kaeding knew his exposure to vermiculite could cause asbestosis and had hired an attorney experienced in asbestos litigation four years prior to his diagnosis. *Id.* at 1261. That attorney also had a doctor review Kaeding's medical records, and he found them consistent with asbestosis. *Id*. The Court concluded: with "the numerous references to asbestosis in his medical records, Kaeding's knowledge of his risk for asbestos-related diseases from exposure at W.R. Grace, and the conclusions [the doctor] rendered in 1992, Kaeding should have discovered that he suffered from asbestosis by September or October of 1992, at the latest." *Id*.

Contrary to Tricon's argument, *Hando* and *Nelson* indicate that the existence of symptoms at the time of exposure does not necessarily prevent an injury from being self-concealing. Like *Hando* and *Nelson*, Ambrose experienced symptoms during his employment that he believed may have been connected to his exposure. Also like *Hando* and *Nelson*, Ambrose continued to experience symptoms after leaving his employment and, despite seeking medical treatment, a connection was not initially made between his exposure and his medical condition. Tricon insists this case is comparable to *Kaeding*, however, because Ambrose was aware of the specific health risks related to AntiBlu XP64. Ambrose admits that he read the Material Safety Data Sheet on AntiBlu XP64, which notes that

8

"[r]epeated inhalation exposure may cause . . . permanent lung damage." (Doc. 23-5 at 3; *see also* Ambrose Depo., Doc. 18-1 at 46.) Ambrose also admits that he attended a lecture by a representative from the chemical company and was told that the chemicals were dangerous. (Doc. 23 at ¶ 26.) While this indicates that Ambrose may have been aware of the danger, the "Citation and Notification of Penalty" issued by the Occupational Safety and Health Administration in August 2012 supports Ambrose's argument that he was uninformed of the risks, stating "[o]n or about March 06, 2012 and at times prior thereto, the employer did not ensure employees were trained to recognize the hazards regarding the limitations of the respirator use and respiratory hazards such as, but not limited to . . . (ANTIBLU XP64)." (Doc. 23-6 at 2.) "[T]he state of [Ambrose]'s knowledge is a factual issue which cannot be resolved in summary judgment . . . ." *Muller*, 97 F.3d at *2; *compare with Roybal v. Bank of Am., N.A.*, 2015 WL 1534118, at *6 (D. Mont. Apr. 6, 2015) (Christensen, J.) (holding the discovery doctrine did not apply as to toll the statute of limitations in a loan modification case where there was no evidence that the plaintiff's injuries were concealed or self-concealing).

Tricon further argues that even if the injury was self-concealing, Ambrose was not diligent in informing his treatment providers about his exposure to AntiBlu XP64. *See* § 27-2-102(3). Tricon's argument is a factual one.

Competing inferences can be drawn from Ambrose's failure to disclose his exposure at an earlier time. While it may show a lack of diligence, his failure to consider that his current symptoms were related to his exposure at Tricon may also reinforce the self-concealing nature of the injury. In *Hando*, the Court determined the plaintiff's continued attempts to seek medical attention and diagnosis showed sufficient diligence despite medical professionals' failure to make the connection. 771 P.2d at 962. Similarly, Ambrose continually sought a medical diagnosis for his ongoing problems and was repeatedly told they stemmed from his cardiac issues. There are a lot of things Tricon believes Ambrose should and could have done to be more diligent, but whether his failure to do them dooms his case is for the jury to decide.

## CONCLUSION

Whether Ambrose's action is barred by the statute of limitations "must be resolved by the trier of fact." *Christian*, 358 P.3d at 153. Accordingly, IT IS ORDERED that Tricon's motion for summary judgment (Doc. 15) is DENIED.

DATED this 11th day of August, 2016.

_____
DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT